UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUSAN STRICKER, ET AL.,

        Plaintiffs,

v.

CAMBRIDGE TOWNSHIP, ET AL.,

        Defendants.

_____/

Case No. 10-14424

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [77] AND GRANTING DEFENDANTS' MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT [81, 83, 85, 37, 76, 79]**

This civil rights action, brought pursuant to 42 U.S.C. § 1983, arises out of Plaintiff Susan Stricker's call to 911 on December 22, 2008 at 7:49 p.m. asking EMS to assist her 20 year old son, Andrew Stricker, who she reported was overdosing on drugs. In addition to Susan Stricker (a registered nurse and licensed attorney), Plaintiffs include her son Andrew, her husband Kevin, and her daughter Jacqueline. (Am. Compl. ¶¶ 9-12.) Defendants include the Township of Cambridge, Lenawee County, and the following individuals in their individual and official capacities:

- Greg Hunt, Sergeant, Cambridge Twp. Police Department;
- Larry Wibbler, Police Chief, Cambridge Twp. Police Department;
- Christopher Kourt, Deputy Sheriff, Lenawee County Sheriff's Department;
- Christopher VanDyke, Deputy Sheriff, Lenawee Cty. Sheriff's Dept.;
- Jack Welch, Sheriff, Lenawee Cty. Sheriff's Department;
- Frank Riley, Asst. Prosecuting Atty., Lenawee County;
- Amy McMullen,Trooper, Michigan State Police;
- Michelle Stuck, Sergeant, Michigan State Police; and
- Peter Munoz, Director, Michigan State Police.

(Am. Compl. ¶¶ 13-23.)  Plaintiffs' 40-page, 49-count complaint alleges federal claims against the various Defendants.  In addition to claims of municipal and supervisory liability, Plaintiffs allege the following constitutional violations:

1. **Fourth Amendment - Warrantless Entry**

Plaintiff Susan's claims against Hunt (Count 5), VanDyke (Count 8), Stuck (Count 10), and McMullen (Count 11); Plaintiff Kevin's claim against Stuck (Count 30); and Plaintiff Andrew's claim against Stuck (Count 45).

2. **Fourth Amendment - Unreasonable Search of Sticker Home**

Plaintiff Susan's claim against Kourt (Count 14); Plaintiff Kevin's claims against Hunt, Kourt, and VanDyke (Counts 21, 23, 28); Plaintiff Andrew's claims against Hunt, Kourt, and VanDyke (Counts 34, 38, 43); and Plaintiff Jacqueline's claim against VanDyke (Count 48 - search of her room).

3. **Fourth Amendment - Unreasonable Seizure/Arrest**

Plaintiff Susan's claim against Kourt (Count 15); Plaintiff Kevin's claim against McMullen (Count 31); Plaintiff Andrew's claim against VanDyke (Count 36); and Plaintiff Jacqueline's claim against Kourt (Count 48).

4. **Fourth Amendment - Excessive Force**

Plaintiff Susan's claim against Kourt (Count 15); Plaintiff Kevin's claims against Hunt and McMullen (Counts 29, 31); Plaintiff Andrew's claim against VanDyke (Count 36).

5. **Prosecutor Liability for Violating Fourth Amendment Rights**

Plaintiffs Susan's, Kevin's, and Andrew's claims against Riley (Counts 1, 18, 44).

6. **§ 1983 Conspiracy to Violate Fourth Amendment Rights**

2

Plaintiffs Susan's, Kevin's, and Andrew's claims against Hunt (Counts 4, 20, 35), VanDyke (Counts 9, 27, 42), McMullen (Counts 12, 32, 46), and Kourt (Counts 13, 22, 37).

7. **Supervisory Liability**

Plaintiffs Susan's and Kevin's claims against Wibbler (Counts 2, 17), and Plaintiffs Susan's, Kevin's, and Andrew's claims against Welsh (Counts 3, 19, 33), Munoz (Counts 7, 26, 41), and Stuck (Counts 10, 30, 45).

8. **Municipal Liability**

Plaintiffs Susan's, Kevin's, and Andrew's claims against Cambridge Township (Counts 6, 25, 40) and Lenawee County (Counts 16, 24, 39).

This matter comes before the Court on the following motions:

1.  Plaintiffs' Rule 56(a), (d)(1) and (d)(2) motion for partial summary judgment [77]; and Defendants' Rule 56(f)(1) cross-motions for summary judgment [81, 83, 85];[1]

2.  Rule 12(b)(6) motion to dismiss brought by Defendants Cambridge Township; Sgt. Greg Hunt, Cambridge Township Police Department; and Larry Wibbler, Police Chief, Cambridge Township Police Department ("Cambridge Township Defendants") [37];

3.  Rule 12(b)(6) or Rule 56 motion to dismiss or for summary judgment brought by Defendants Amy McMullen, Trooper, Michigan State Police; Michelle Stuck, Sergeant, Michigan State Police; and Peter Munoz, Director, Michigan State Police ("Michigan State Police Defendants") [76]; and

4.  Rule 12(b)(6) motion to dismiss brought by Defendants Lenawee County, Lenawee County Deputy Sheriff Kourt, Lenawee County Deputy Sheriff VanDyke, Lenawee

---

[1]In their Responses, all Defendants moved for summary judgment in their favor pursuant to Fed. R. Civ. P. 56(f)(1).

County Sheriff Welch, and Lenawee County Assistant Prosecutor Riley ("Lenawee County Defendants") [79].

For the reasons stated below, this Court DENIES Plaintiffs' motion for partial summary judgment and GRANTS Defendants' motions to dismiss and for summary judgment.

**I.   Facts**

On December 22, 2008 at 7:49 p.m., Plaintiff Susan Stricker called 911 to report that her twenty-year-old son, Plaintiff Andrew Stricker, was overdosing on drugs and requested EMS assistance at their home at 6777 Onsted Highway, Onsted, Michigan. She reported that her son was falling down, losing consciousness, that he was "not in touch with reality," could not talk to her, did not know his name, and could not stand straight or move. 911 told her that they would be sending an ambulance to her address. (Mich. State Police Defs. Mot. [48], Ex. A, Attachment 1, CD of initial 911 call.)[2]

**A.   Defendant Officers' Version of Events**

**1.   Defendant Hunt, Sergeant, Cambridge Police Department**

At about 8:00 p.m., Sgt. Hunt of the Cambridge Police Department was the first officer to arrive on the scene. His report states the following. The Cambridge Township Fire and Rescue personnel had arrived and were waiting for police to secure the scene. While en route, Sgt. Hunt conversed with central dispatch about the identity of the overdose victim and informed them that he had previously arrested two heroin addicts who live at the address provided, i.e., Andrew Stricker and his brother. (Pls.' Resp., Ex. C, Hunt Rept. at 1.) Upon arrival at Plaintiffs' home, Sgt. Hunt knocked and was allowed in by Plaintiff Kevin

---

[2]This Exhibit contains only the audio recording of the initial 911 call.

4

Stricker. (*Id*.) Upon entry, Sgt. Hunt asked Kevin how Andrew was, and Kevin told him that Andrew was not doing too good. (*Id*.) At that point, Sgt. Hunt was about to call central dispatch and instruct them to send the rescue personnel up to the home when he was interrupted by Plaintiff Susan Stricker. She asked him if he was a cop; and when he affirmed that he was a police officer, Plaintiff told him that she did not call the police, did not want the police on her property, ordered Sgt. Hunt to leave, and told him that she was calling the state police. (*Id*.) Sgt. Hunt informed Plaintiff Susan Stricker that rescue personnel would not come without a police officer present on the scene for their safety, and Plaintiff told him that she did not care, that he should leave, and that her son was fine now. (*Id*.) Sgt. Hunt left Plaintiffs' home and waited at the end of Plaintiffs' driveway with the medical personnel.

At that point, Deputy Sheriff VanDyke from the Lenawee County Sheriff's Department arrived. (*Id*.) Sgt. Hunt and Deputy Sheriff VanDyke went up to Plaintiffs' residence and were told to leave despite Plaintiff Susan Stricker having called 911 reporting that her son was overdosing on drugs. (*Id*.) Despite being informed that the officers needed to check on their son's welfare, Plaintiffs Susan and Kevin Stricker refused to open the door and allow the officers to do so. (*Id*.) Sgt. Hunt and Deputy Sheriff VanDyke retreated from Plaintiffs' front door after Plaintiffs made a request that state police respond to their 911 call. (*Id*.)

State Trooper McMullen then arrived on the scene. (*Id.* at 2.) She tried to reason with Plaintiffs Susan and Kevin Stricker, but Plaintiffs refused to allow the officers in or Andrew out of the house to be checked by medical personnel. (*Id.* at 2.) Defendant officers advised Plaintiffs to either open the door or they would enter. Plaintiffs refused to allow

5

entry.   The officers informed Plaintiffs that they were entering under emergency circumstances, failed in their attempt to force open the dead-bolted door, and then used a halligan tool and forced open the front door.   Upon entry, the officers secured the premises and got Plaintiff Andrew out to the waiting ambulance.   Plaintiff Andrew told the medical tech/paramedic Tom Brown that he had taken seven one-milligram Xanax pills and had shot-up some heroin.   (*Id.* at 2.)   Tom Brown advised Sgt. Hunt and Trooper McMullen of this and then gave Andrew two milligrams of Narcon and transported him to the hospital. He told the officers that Andrew had to be transported to the hospital quickly to avoid being intubated or getting worse.   (*Id.*)   Sgt. Hunt followed the ambulance to the hospital because Plaintiff Andrew had been arrested for the illegal use of heroin.   Upon arrival at the hospital, Plaintiff Andrew advised the emergency room staff that he had overdosed on heroin and Xanax.   Sgt. Hunt guarded Plaintiff Andrew at the hospital.   (*Id.*)

## 2.  Defendant VanDyke, Deputy Sheriff, Lenawee County Sheriff's Dept.

Deputy Sheriff VanDyke's incident report states the following.   He was sent to Plaintiffs' home to assist the Cambridge Township Fire Department on a reported drug overdose.   Central dispatch advised him that Sgt. Hunt was going to the residence to secure the scene until he arrived.   While en route, VanDyke heard Sgt. Hunt advise dispatch that he was on the scene and Plaintiffs were ordering him off the property.   (Pls.' Resp., Ex. D, VanDyke incident rpt. at 1.)

Deputy Sheriff VanDyke arrived at Plaintiffs' home and was briefed by Sgt. Hunt.  Sgt. Hunt told him that he had observed Plaintiff Andrew sitting in a chair at a table and that he looked very pale.   Sgt. Hunt also told VanDyke that Plaintiff Kevin Stricker let him in Plaintiffs' home and told him that Andrew was not doing too good; but when he went to call

6

medical personnel up to Plaintiffs' home, Plaintiff Susan Stricker ordered him off the property after he told her he was a cop.  She told him that he better get a warrant, and he left Plaintiffs' home after unsuccessfully trying to reason with Plaintiff Susan.  (*Id.* at 2.)

Deputy Sheriff VanDyke and Sgt. Hunt then went back up to Plaintiffs' front door and asked Plaintiff Susan to open the door so they could make sure that Andrew was okay.  She told them that Andrew was fine and that she did not want the police at her house.  (*Id.*)  Despite VanDyke's explanation that someone had called 911 and the officers had to make sure Andrew was okay, Plaintiff Susan refused to allow the police in without a warrant.  She told the officers to leave her property or she would call the police.  She stated that she wanted to talk to the Michigan State Police and was going to file charges against the officers for being on her property.  VanDyke tried to reason with Plaintiff Susan to let the medical personnel in to make sure her son Andrew was alright, but she refused.  So, Deputy Sheriff VanDyke and Sgt. Hunt left Plaintiffs' front door and waited for the State Police.  (*Id.*)

State Trooper Amy McMullen then arrived on the scene and was briefed by Deputy Sheriff VanDyke and Sgt. Hunt.  Trooper McMullen requested that VanDyke and Hunt accompany her to Plaintiffs' front door.  She attempted to reason with Plaintiffs Susan and Kevin Stricker to let her check the welfare of their son Andrew, but they refused again.  They also refused to allow Andrew to come outside to talk with medical personnel and allow them to check him out.  (*Id.*)  Plaintiff Susan was screaming at all the officers to get off her property.  After several unsuccessful attempts to reason with Plaintiffs Susan and Kevin, they were told that if they would not let Andrew out or let medical personnel in, then the officers would force their front door open.  (*Id.* at 3.)  After Plaintiffs' continued refusal, the

7

officers forced the door open.  Once inside, the officers secured the residence.  Plaintiffs Kevin, Susan and Andrew Stricker were all placed in handcuffs for officer safety.  Once the residence was secure, Plaintiff Andrew was looked at by medical personnel who determined that he needed to go to the hospital.  (*Id.*)

Plaintiffs Kevin and Susan Stricker berated the officers for forcing their door open, and Plaintiff Susan told Trooper McMullen that she had called her Sergeant and told all the officers that she would have them all fired.  Plaintiff Susan repeatedly told the officers that she was an attorney and a registered nurse with the State of Michigan, that she knew her rights, and that she would sue all of them.  (*Id.*)  The State Police arrested Plaintiffs Kevin and Susan Stricker.  Deputy Sheriff VanDyke transported Plaintiff Kevin Stricker to the Lenawee County Jail for Trooper McMullen, and he was booked.  (*Id.*)

Deputy Sheriff VanDyke and Trooper McMullen saw Plaintiff Andrew at Bixby Hospital. He thanked them for getting him to the hospital and told them that this was the third time that he had overdosed and promised that he would clean himself up.  Plaintiff Andrew was released from the hospital about 3:15 a.m., was transported to the Lenawee County jail, and was booked.  (*Id.*)

### 3. Trooper McMullen's Incident Report

Trooper McMullen's incident report and Affidavit state the following.  She was dispatched to Plaintiffs' home on a possible heroin overdose.  While en route, Trooper McMullen was informed by dispatch that a woman had called 911 from the location of 6777 Onstead Highway to report that her son was overdosing on drugs and was refusing to let officers into the house.  She was also informed that the woman has specifically requested the presence of the Michigan State Police.  Upon arrival, Deputy Sheriff VanDyke and Sgt.

8

Hunt advised her that the possible overdose victim was a known heroin user by the name of Andrew Stricker. Sgt. Hunt told Trooper McMullen that Andrew Stricker had previously been arrested by him on heroin-related charges. (Pls.' Resp., Ex. E, McMullen Incident Rpt. at 1; State Police Defs.' Mot., Ex. A, McMullen Aff. ¶¶ 2-8.)

Trooper McMullen went to Plaintiffs' front door, announced "State Police, Trooper McMullen," and could faintly hear a man's voice telling her to "go away, we don't need any help." (McMullen Incident Rpt. at 1; McMullen Aff. at ¶ 9.) Plaintiffs' home was completely dark. She could not see into the home or identify how many people were present inside. (McMullen Incident Rpt. at 1.)

Trooper McMullen again knocked loudly and said that she needed to check Plaintiff Andrew's welfare and was not leaving until that was done. Again, Trooper McMullen could faintly hear a man's voice through the front door telling her that the officers would have to get a warrant because Andrew was not coming out. (*Id.*)

Then, Plaintiff Kevin came to the door and showed his face through the window. He told the officers that they could not come in, that they needed to go away, and that Andrew was fine and was not coming out. Trooper McMullen tried to negotiate with Plaintiff Kevin to allow Andrew to at least come outside to the porch so that medical personnel could check him and make sure he was okay. Plaintiff Kevin refused to allow Andrew to come outside. (McMullen Incident Rpt. at 1; McMullen Aff. at ¶¶ 10-11.)

Trooper McMullen advised Plaintiff Kevin that if he did not allow law enforcement and medical personnel in, the officers would have no choice but to force their way in to make sure that Andrew had not overdosed on drugs. Plaintiff Kevin repeatedly refused to allow the officers in. (McMullen Incident Rpt. at 2.) A few minutes later, Plaintiff Kevin was

9

observed standing at another window with Andrew.  Sgt. Hunt confirmed that this was Andrew.  Through the window, Trooper McMullen asked Andrew to come outside on the porch so he could be checked by medical personnel.  Andrew refused to do so.  Plaintiff Andrew appeared very pale and could not focus on Trooper McMullen's face even though their faces were only a few inches apart.  His eyes were moving cross eyed and apart and his eyelids looked very heavy.  He did not appear alert or in any condition to refuse medical treatment.  He appeared to be holding himself up to keep from falling by placing his hands on the window.  (McMullen Incident Rpt. at 2; McMullen Aff. at ¶¶ 12-13.)

From Plaintiffs' front porch, Trooper McMullen contacted Sgt. Stuck, the duty sergeant at the Michigan State Police Department, and advised her of the situation.  Sgt. Stuck advised Trooper McMullen that the officers should force their way inside to assist Andrew and get him medical attention because, as the officers reported, he clearly required medical attention.  Determining that a medical emergency warranted a forced entry, the officers forced open Plaintiffs' front door.  Factors considered included:  the 911 call reporting a drug overdose; Sgt. Hunt's and Deputy VanDyke's prior contact with Andrew who had admitted heroin use to them in the past; because of his past heroin use, it was more likely than not that he was overdosing now; and the refusal by Plaintiff Susan, despite her 911 call, to allow Andrew to obtain medical attention as well as refusals by Plaintiffs Kevin and Andrew.  (McMullen Incident Rpt. at 2; McMullen Aff. at ¶¶ 14-18.)  Trooper McMullen also contacted Asst. Prosecutor Riley and told him what she had observed regarding Andrew's appearance, that his mother Susan Stricker had called 911 to report that he was overdosing on drugs, and that he was known to the other officers to be a heroin user.  Based on these facts, Trooper McMullen told Prosecutor Riley that she believed that

10

exigent circumstances permitted a warrantless entry into Plaintiffs' home, and he agreed with Trooper McMullen.  (McMullen Aff. at ¶ 19.)

After Deputy Sheriff VanDyke and Sgt. Hunt unsuccessfully tried to force the front door open with their feet, Sgt. Hunt retrieved a halligan tool from his patrol car.  Deputy VanDyke used the tool and was able to force the front door open.  (McMullen Incident Rpt. at 2.)  Trooper McMullen was the first to make entry and did so with her weapon drawn. (*Id.* at 3.)  She observed Plaintiff Kevin descending the stairs just inside the front door.  She ordered Plaintiff Kevin to the ground, placed him in handcuffs, patted him down for weapons, and then moved on to continue a protective sweep with Deputy VanDyke.  Sgt. Hunt stayed with Plaintiff Kevin and secured the entry point and the stairway.  (*Id.*)  Trooper McMullen avers that she did not at any time place her weapon to Plaintiff Kevin Stricker's head.  (McMullen Aff. at ¶ 21.)

After conducting a protective sweep of the ground floor and finding no persons, Trooper McMullen and Deputy VanDyke then went to the basement and found Plaintiff Andrew hiding behind some items.  Plaintiff Andrew was placed in handcuffs and patted down for weapons by Deputy VanDyke.  (McMullen Incident Rpt. at 3.)  Trooper McMullen continued the protective sweep to a closed bedroom door that Andrew identified as belonging to William Stricker.  This area was swept and no persons were found.  (*Id.*) Trooper McMullen avers that at no time did she perform more than a cursory sweep of the ground floor and basement of Plaintiffs' home and only in areas where a person could be located.  (*Id.* at ¶¶ 22-25.)

Andrew was removed from the basement to the front door area.  (McMullen Incident Rpt. at 3.)  Deputy VanDyke secured Plaintiff Kevin just inside the front door while Trooper

McMullen got Andrew to the waiting ambulance.   Deputy Sheriff Kourt and Sgt. Hunt ascended the stairs to the upper level of Plaintiffs' home to continue the protective sweep. (*Id.*)

Once Trooper McMullen saw that Andrew was receiving medical attention, she returned to the front door area and learned that the protective sweep of the upstairs had yielded Plaintiff Susan and her 14-year-old daughter Jacqueline.  Plaintiff Susan had been checked for weapons and placed in handcuffs by Deputy Kourt.  (*Id.*)

Sgt. Stuck from the Michigan State Police arrived on the scene after the forced entry and protective sweep were completed.  (Pls.' Resp., Ex. F, McMullen Suppl. Rpt. at 2.) Plaintiffs Kevin and Susan Stricker had requested her presence and asked her to "un-arrest" them.  Sgt. Stuck declined their requests.  (*Id.*)

Paramedic Tom Brown advised Trooper McMullen that Andrew had admitted to him that he had taken seven 1 mg. pills of Xanax along with one-half of a one-tenth gram of heroin around 7:00 p.m.  Brown also told her that Andrew's pupils were pinpoint, that he had a heart rate of 160, that Brown had given him 2 mg. of Narcon in the ambulance and needed to leave the scene as soon as possible as Andrew might need to be "tubed."  (Pls.' Resp., Ex. E, McMullen Incident Rpt. at 3.)  Trooper McMullen told Brown to go to the hospital and that Sgt. Hunt would follow him because Andrew was in custody for use of heroin.  Brown left the scene a few minutes later and traveled in the ambulance with Andrew to Bixby Medical Center.  (*Id.*)

Trooper McMullen then had Jacqueline Stricker assist her in finding a safe place to stay overnight while her family was gone.  Plaintiffs Kevin and Susan Stricker were told that a friend, Kaylee, could take her overnight and they gave their approval for Jacqueline to do

12

so.  (*Id.*)  Deputy Kourt stayed with Jacqueline at the scene while she waited to be picked up.  (*Id.* at 4.)

While still on the scene, Trooper McMullen called dispatch and asked the dispatcher to contact the on-call magistrate about revoking Plaintiff Andrew Stricker's bond.  The dispatcher did so.  He then called Trooper McMullen back and told her that, although the magistrate determined that the bond conditions could not be revoked, she suggested that McMullen call the on-call Prosecutor for further assistance on a possible drug use charge.  (Pls.' Resp., Ex. F, McMullen Suppl. Rpt. at 1.)

Trooper McMullen then asked dispatch to contact the on-call prosecutor.  Trooper McMullen was able to contact Prosecutor Riley at his home at around 10:00 p.m.  She briefed him about what had occurred up to that point, and he authorized Trooper McMullen to take Plaintiff Andrew into custody for "use" and advised her to make sure that blood was drawn at the hospital as part of his overdose care.  Prosecutor Riley told Trooper McMullen that he was satisfied with the decision to charge Plaintiffs Kevin and Susan Stricker with resisting and obstructing a police officer.  (*Id.*)

Trooper McMullen and Deputy VanDyke went to the Lenawee County Jail with Plaintiffs Kevin and Susan Stricker.  Plaintiff Susan was transported by Trooper McMullen, and Plaintiff Kevin was transported by Deputy VanDyke.  (Pls.' Resp., Ex. E, McMullen Incident Rpt. at 4.)  Plaintiff Kevin Stricker was arrested for assault/resist/obstructing a police officer in violation of Mich. Comp. Laws 750.81d(1); Plaintiff Susan Stricker was arrested for that same charge and also for filing a false report in violation of Mich. Comp. Laws 750.309; and Andrew Stricker was arrested for substance use in violation of Mich. Comp. Laws 333.7404.  (*Id.*)

13

Trooper McMullen went to visit Plaintiff Andrew in his hospital room at Bixby. She advised him of his *Miranda* rights via a card, and Andrew told her that he understood his rights and wished to speak to Trooper McMullen. Plaintiff Andrew told Trooper McMullen that he did not want to comment about the use of heroin that day, but did state that he was not aware that his mother had called 911 for him, and then stated that he did not wish to make any more comments without his lawyer being present. Trooper McMullen ended the interview at that point. (Pls.' Resp., Ex. F, McMullen Suppl. Rpt. at 2.) Deputy VanDyke stayed with Andrew and later transported him to the Lenawee County Jail for processing. (*Id.* at 3.)

### B. Plaintiffs' Version of Events

#### 1. Plaintiff Susan Stricker

EMS was already at Plaintiffs' home when Sgt. Hunt arrived. Sgt. Hunt walked into Plaintiffs' home through the front door entrance to examine Andrew. Plaintiff Susan told Sgt. Hunt that she was a registered nurse, that she had examined Andrew, that he was fine, and there was no longer any need for EMS. Plaintiffs Susan and Kevin Stricker told Sgt. Hunt and EMS that they did not need their services for their son Andrew. (Pls.' Resp., Ex. A, S. Stricker Aff. ¶¶ 4-5.) Nonetheless, while in their home, Sgt. Hunt performed a welfare check on Andrew and, finding that he was not in need of immediate medical attention, then left their home. Sgt. Hunt told Plaintiffs that he was going to call central dispatch and cancel the 911 request. (*Id.* at ¶¶ 6-7.)

At around 8:00 p.m., Sgt Hunt returned to Plaintiffs' front porch with Deputy Sheriff VanDyke where they discussed arresting Andrew for a bond violation. (*Id.* at ¶¶ 8-9.) The two officers began pounding on Plaintiffs' front door, demanding that the door be opened

14

or Andrew be sent out to speak with them.  The officers also shined flashlights through the windows.  (*Id.* at ¶ 10.)  At about 8:01 p.m., Plaintiff Kevin Stricker told the officers through the front door that both he and Susan had observed Andrew, that he was fine, there was no need for EMS assistance, and that they were going to call the officers' supervisors to get them to stop pounding on their front door.  (*Id.* at ¶ 11.)  Plaintiffs Kevin and Susan Stricker told the officers that they had to get a warrant before Kevin Stricker would open the door.  Plaintiff Kevin Stricker called 911 and said the call was a false alarm and the request for help should be cancelled.  At about 8:19 p.m., Plaintiff Susan Stricker called the Lenawee Sheriff's Department and requested that a supervisor be sent to Plaintiffs' home to make the two officers stop banging on their front door.  (*Id.* at ¶¶ 12-14.)

State Police Trooper Amy McMullen arrived at Plaintiffs' home, came to the door, and began yelling for Plaintiff Kevin Stricker to open the front door.  (*Id.* at ¶ 15.)  At about 8:25 p.m., Deputy Sheriff Kourt from the Lenawee County Sheriff's Department arrived at Plaintiffs' home and joined in kicking on their front door.  (*Id.* at ¶ 16.)  All of the officers repeatedly kicked and pounded on Plaintiffs' front door, yelling that Plaintiffs should send Andrew outside to be seen or they would break the door in.  They told Plaintiffs that it was their office policy that they had to be let into the home to perform a welfare check if a 911 call was made.  (*Id.* at ¶¶ 17-18.)

Plaintiff Andrew stood inside Plaintiffs' home at a large front window to show the officers that he was fine.  State Trooper McMullen observed Plaintiff Andrew.  Plaintiff Andrew told Trooper McMullen that he did not want treatment.  (*Id.* at ¶¶ 19-20.)

Plaintiff Kevin Stricker told the officers that they would be allowed into Plaintiffs' home after they obtained a warrant.  (*Id.* at ¶ 21.)

At about 8:30 p.m., Sgt. Hunt, Deputy Sheriffs VanDyke and Kourt, and Trooper McMullen broke down Plaintiffs' front door and entered their home. Deputy Sheriff Kourt went upstairs, kicked in Plaintiff Susan's locked bedroom door, pointed a taser gun at her and "roughly" handcuffed her. Deputy Sheriff VanDyke kicked in the bedroom door of Plaintiffs Susan's and Kevin's daughter Jacqueline, ordered her to the floor, and then moved her to Plaintiff Susan's bedroom "to witness [her] mistreatment." Deputy Sheriff Kourt then "put a forceful pressure hold on" Plaintiff Susan's "neck to force her to stand." She and Jacqueline were then ordered downstairs, and Plaintiff Susan was handcuffed to a chair. (*Id.* at ¶¶ 23-27.)

The officers then conducted a warrantless search of Plaintiffs' home. (*Id.* at ¶ 28.) The officers went far beyond a protective search, they searched dressers and kitchen cabinets and drawers, along with closets and the bedroom of Plaintiff Susan's other son. Plaintiff Susan's knowledge of the scope of the search is based on her review of her home after she was released from jail. (Pls.' Resp., Ex. H, S. Stricker Suppl. Aff. ¶¶ 2-3.)

The officers forced Plaintiff Andrew out of Plaintiffs' home to the driveway to be treated by EMS, and forced Plaintiffs to leave their minor daughter Jacqueline with Deputy Sheriff Kourt while Plaintiffs were taken to jail. (Pls.' Resp., Ex. A, S. Stricker Aff. at ¶¶ 29-30.)

The officers charged Plaintiff Susan with resisting arrest and making a false 911 call, charged Kevin Stricker with resisting arrest in violation of Mich. Comp. Laws § 730.81d, and charged Andrew Stricker with substance use in violation of Mich. Comp. Laws § 333.7404. (*Id.* at ¶ 31.) The next day, the prosecutor's office dismissed the substance use charge against Plaintiff Andrew and the false 911 call charge against Plaintiff Susan. (*Id.* at ¶ 32.) The prosecutor subsequently charged Plaintiff Andrew with resisting arrest. The resisting

16

arrest charges against Plaintiffs Andrew and Susan were later dismissed.  Plaintiff Andrew

had been on bond for a charge of reckless driving, the prosecutor had the bond increased

to $10 million, the bond could not be met, and Plaintiff Andrew had to spend one month in

jail.  (*Id.* at ¶¶ 35-38.)

### 2.  Plaintiff Kevin Stricker

In his affidavit, Plaintiff Kevin Stricker attests that he told the officers that his son

Andrew was fine and there was no need for assistance, he told the 911 dispatcher that the

911 call was a false alarm and should be cancelled, and told the officers that he would not

open the door unless the officers first obtained a search warrant.  (Pls.' Resp., Ex. B, K.

Stricker Aff. ¶¶ 2-6.)  State Trooper McMullen entered Plaintiffs' home with her gun drawn

and yelled at Plaintiff Kevin to get on the floor.  After he did so, she held the gun to his head

while she handcuffed him.  She then left him face down on the floor for about 30 minutes.

(*Id.* at ¶¶ 7-8.)  Plaintiff Kevin was charged with resisting arrest in violation of Mich. Comp.

Laws § 730.81d.  In return for obtaining Andrew's release from jail, Plaintiff Kevin agreed

to and did plead guilty to attempt to resist arrest.  (*Id.* at ¶¶ 10, 15.)

### C.  Jacqueline Stricker

In her March 23, 2011 affidavit, Jacqueline avers that Defendant VanDyke kicked

open her bedroom door, ordered her to the floor, and then took her to her mother's

bedroom.  She further avers that Defendant McMullen pulled her aside and asked her

about the presence and use of illegal drugs in her home.  (Pls.'s Mot., Ex. 3, 3/23/11 J.

Stricker Aff. ¶¶ 1-3.)

## II.   Standard of Review

17

### A. Rule 12(b)(6) Motions to Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint.  In a light most favorable to the plaintiff, the court must assume that the plaintiff's factual allegations are true and determine whether the complaint states a valid claim for relief.  *See Albright v. Oliver*, 510 U.S. 266 (1994); *Bower v. Fed. Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996).  To survive a Rule 12(b)(6) motion to dismiss, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and emphasis omitted).  *See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007).  "[T]hat a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of all the elements of a cause of action, supported by mere conclusory statements do not suffice." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009)  The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 1950 (internal quotation marks and citation omitted).  Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Id.* (internal quotation marks and citation omitted).  Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions,

18

are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.*  In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  *Id.* at 1949 (internal quotation marks and citation omitted).

### B.  Rule 56 Motions for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address

19

another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or

(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).   "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.   Analysis

Plaintiffs' motion seeks a partial judgment finding Defendants liable on each of the constitutional and statutory violations alleged in their First Amended Complaint. Defendants' motions seek dismissal and summary judgment in their favor on Plaintiffs' claims.[3]  The Court begins by analyzing whether Defendant Officers' warrantless entry into the Stricker home in response to an emergency 911 phone call from Plaintiff Susan Stricker

---

[3]In their Responses to Plaintiffs' motion for partial summary judgment, all Defendants seek summary judgment in their favor pursuant to Fed. R. Civ. P. 56(f)(1).

20

reporting that her son Andrew was overdosing on drugs was justified under the exigent circumstances exception to the Fourth Amendment's warrant requirement.

### A. Fourth Amendment - Warrantless Entry Justified by Exigent Circumstances

Plaintiffs argue that the warrantless entry into their home by Defendants Hunt, VanDyke, McMullen, Stuck, and Kourt[4] was not justified by exigent circumstances and thus violated their Fourth Amendment rights. Defendants argue the opposite. This Court agrees with Defendants, and Plaintiffs claims arising from Defendants' warrantless entry into Plaintiffs' home are dismissed with prejudice.

This is not an issue of first impression. The United States Supreme Court and the Sixth Circuit have addressed the exigent circumstances/emergency aid exception to the warrant requirement. *See, e.g., Michigan v. Fisher*, 130 S. Ct. 546 (2009); *Brigham City v. Stuart*, 547 U.S. 398 (2006); *Johnson v. City of Memphis*, 617 F.3d 864 (6th Cir. 2010), *cert. denied*, 131 S. Ct. 1478 (2011); *Thacker v. City of Columbus*, 328 F.3d 244 (6th Cir. 2003). These decisions provide the legal principles that guide the Court's decision here.

"The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." *Johnson*, 617 F.3d at 867 (internal quotation marks and citations omitted). Physical entry into the home is "the chief evil that the Fourth Amendment protects against. . . ." *Id.* (internal quotation marks and citations omitted). "Searches of the home must be reasonable," and

---

[4]Plaintiffs' amended complaint does not allege a Fourth Amendment warrantless entry claim against Defendant Kourt.

thus "generally require[] that police obtain a warrant based upon a judicial determination of probable cause prior to entering a home." *Id.* at 867-68 (internal quotation makes and citation omitted). "Warrantless entries into the home are 'presumptively unreasonable.'" *Id.* at 868 (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). But, "that presumption can be overcome." *Fisher*, 130 S. Ct. at 548.

Because "the ultimate touchstone of the Fourth Amendment is 'reasonableness,' there are several exceptions to the warrant requirement that are ultimately grounded in that standard." *Johnson*, 617 F.3d at 868 (internal quotation marks and citation omitted). "Lists of recognized exceptions are inclusive rather than exclusive," and "'exigent circumstances' are one such exception." *Id.* "Exigent circumstances arise when an emergency situation demands immediate police action that excuses the need for a warrant." *Id.*

In *Brigham City*, "police responded to a call complaining of a loud party in the neighborhood" and, while looking "through the home's front window," they observed that "a fight [was] breaking out in the kitchen" and one individual had "a cut lip," and "entered the home without consent or a warrant, prevented further violence, and made several arrests." *Id.* (citing *Brigham City*, 547 U.S. at 400-01). The *Brigham City* Court "held that entry was objectively reasonable under the circumstances and constitutional under the emergency aid exception." *Id.* (citing *Brigham City*, 547 U.S. at 406-07). The Supreme Court concluded that "the need to assist persons who are seriously injured or threatened with injury" is an exigency that obviates the need for a warrant, and thus "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City*, 547 U.S. at 403.

22

In *Brigham City*, the Supreme Court also rejected an argument that Plaintiffs make here – "that the officers were more interested in making arrests" than rendering emergency assistance. *Id.* That argument conflicts with the well-established principle that a defendant officer's subjective motivation is irrelevant to Fourth Amendment analysis.

> Our cases have repeatedly rejected this approach. An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action. The officer's subjective motivation is irrelevant. It therefore does not matter here – even if their subjective motives could be so neatly unraveled – whether the officers entered the kitchen to arrest respondents and gather evidence against them or to assist the injured and prevent further violence.

*Id.* at 404 (internal quotation marks and citations omitted).[5]

In *Fisher*, the Supreme Court considered whether it was objectively reasonable and thus constitutional under the emergency aid exception for police officers to enter a home without a warrant when they responded to a complaint of a disturbance in the neighborhood and "found a household in considerable chaos," observed a damaged "pickup truck in the driveway. . . and three broken house windows [with] the glass still on the ground outside," and "blood on the hood of the pickup and on cloths inside of it, as well as on one of the doors to the house." *Fisher*, 130 S. Ct. at 547. "Through a window, the officers could see.

_____

[5]The Court recently reiterated this principle in a decision where it concluded "that the exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment." *Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011). It explained that "[t]he reasons for looking to objective factors, rather than subjective intent, are clear. Legal tests based on reasonableness are generally objective, and this Court has long taken the view that evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer." *Id.* at 1859 (internal quotation marks and citation omitted).

. . Fisher, inside the house, screaming and throwing things." *Id.* Although Fisher refused to answer the door, the police could see that he "had a cut on his hand, and they asked him whether he needed medical attention." *Id.* "Fisher ignored these questions and demanded . . . that the officers go to get a search warrant." *Id.* One of the officers "then pushed the front door partway open and ventured into the house," "saw Fisher pointing a gun at him," and "withdrew." *Id.* Fisher was subsequently "charged under Michigan law with assault with a dangerous weapon and possession of a firearm during the commission of a felony." *Id.* The trial court granted Fisher's motion to suppress the officer's statement that he pointed a rifle at him based on the conclusion that the officer "violated the Fourth Amendment when he entered Fisher's house," and that decision was affirmed on appeal. *Id.* at 547-48. The Supreme Court reversed, finding the Michigan Court of Appeals' decision "contrary to our Fourth Amendment law, particularly *Brigham City*. . . ." *Id.* at 548.

The *Fisher* Court explained that the "'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." *Id.* "It requires only an objectively reasonable basis for believing that a person within [the house] is in need of immediate aid." *Id.* (internal quotation marks and citations omitted). Rejecting the Michigan Court of Appeals' analysis, the *Fisher* Court clarified that there is no need for police to evaluate whether the emergency is serious enough to justify a warrantless entry. *Id.* "Even a casual review of *Brigham City* reveals the flaw in this reasoning. Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Id.* "It was error for the

24

Michigan Court of Appeals to replace [an] objective inquiry into appearances with its hindsight determination that there was in fact no emergency." *Id.* "It sufficed to invoke the emergency aid exception that it was reasonable to believe that Fisher had hurt himself (albeit nonfatally) and needed treatment that in his rage he was unable to provide, or that Fisher was about to hurt, or had already hurt, someone else. The Michigan Court of Appeals required more than what the Fourth Amendment demands." *Id.*

In *Johnson v. City of Memphis*, the Sixth Circuit applied *Brigham City* and *Fisher* and considered whether the police officers' warrantless entry into a home in response to an emergency 911 call was "sufficient to allow officers to enter a home without a warrant or consent." 617 F.3d at 869. It first observed that, while its decision in *Thacker* "upheld the district court's grant of summary judgment for the police defendants" on a similar Fourth Amendment claim and held "that the police were justified in entering without a warrant due to the exigencies of the situation," . . . "it did not decide the question of whether the 911 call alone justified entry." *Id.* Although the *Johnson* court "decline[d] to establish a per se rule for all 911 hang calls,"[6] it held that "the combination of a 911 hang call, an unanswered return call, and an open door with no response from within the residence is sufficient to satisfy the exigency requirement." *Id.* at 870-71. The *Johnson* court affirmed the district court's finding "that the police were justified in entering the home to sweep for a person in need of immediate assistance under the emergency aid exception." *Id.* at 870. It reasoned that "[t]he whole point of the 911 system is to provide people in need of emergency

---

[6]The court explained that "[a] 911 hang call occurs when a caller dials 9-1-1, hangs up before speaking with the operator, and the operator is unable to reach the caller when attempting to return the call." *Johnson*, 617 F.3d at 866, n.1.

assistance an expeditious way to request it. . . .  Because a 911 call is by its nature an appeal for help in an emergency, the emergency aid exception best fits the attitude of police responding to a 911 call under the circumstances presented here."  *Id.* at 871.

Similar to Plaintiffs here, the plaintiff in *Johnson* relied on a district court decision, *United States v. Meixner*, No. 00-20025, 2000 WL 1597736 (E.D. Mich. Oct. 26, 2000), to support her Fourth Amendment claim.  Although it found the facts in *Meixner* were distinguishable, the Sixth Circuit went further and expressly rejected the *Meixner* court's analysis of the 911 hang-up call as "unpersuasive."  *Johnson*, 617 F.3d at 871.  Disagreeing with the *Meixner* court, the Sixth Circuit observed that "911 hang-up calls *do* convey information.  They do not convey certainties, but certainties are not required."  *Id.*

> 911 hang-ups inform the police that someone physically dialed 9-1-1, the dedicated emergency number, and either hung up or was disconnected before he or she could speak to the operator.  An unanswered return call gives further information pointing to a probability, perhaps a high probability, that after the initial call was placed the caller or the phone has somehow been incapacitated.  In some percentage of cases involving this set of facts, a person is in need of emergency assistance.  Because the "ultimate touchstone" of the Fourth Amendment is reasonableness, certainty is not required.

*Id.*

In its earlier *Thacker* decision, the Sixth Circuit considered whether the warrantless entry of police officers was justified under the exigent circumstances exception when responding to a 911 call placed from the home.  328 F.3d at 253.  Defendant officers argued that the warrantless entry was justified because "they were required to determine whether anything or anyone in plaintiffs' home posed a risk of danger either to themselves or to the paramedics who sought to enter the home to attend to the injured, or, alternatively,

to someone inside the home." *Id.* The Sixth Circuit agreed with the defendant officers. "When the officers arrived at plaintiffs' residence, their observations and the need to safeguard the paramedics supported the conclusion that there existed exigent circumstances, justifying entry into plaintiffs' home without a warrant." *Id.* (citing *Ewolski v. City of Brunswick*, 287 F.3d 492, 503-05 (6th Cir. 2002)). Viewing the facts in the light most favorable to the plaintiffs and considering the information available to the officers before they entered plaintiffs' residence, "including the 911 emergency call, Thacker's conduct, and the uncertainty of the situation," the *Thacker* court concluded that "the totality of the circumstances . . . justified entry to secure the safety of the police, the paramedics, and other people possibly inside the home." *Id.* at 254.

The *Thacker* court discussed the factors that justified the defendant officers' warrantless entry, including the officers' need to "safeguard[] the paramedics while tending to" the plaintiff's injury, and discussed the dilemma officers confront when they respond to a 911 call for assistance but are then "rebuffed" when they attempt to provide assistance.

> The 911 call in this case reported a cutting or stabbing. Such an emergency call requires a police and paramedic response and potentially involves serious peril to the officers, paramedics, or others. The call solicited a response from an emergency team. Although this does not amount to consent justifying the search, it clearly weighs in favor of finding that plaintiffs' expectation of privacy in their home was diminished. The officers were placed in a difficult position in that they were duty-bound to respond to Thacker's request for assistance, but also rebuffed when they attempted to do so.

> The safety of the paramedics and others in this case must also be considered. The officers had to secure the safety of the paramedics before the paramedics could attend to Thacker. Thacker did not explain his injury or anything else to the police while they were on the porch. His demeanor and attitude indicated that Thacker could have posed a threat to the safety of the officers or paramedics. Moreover, it was not clear who else was in the

27

apartment and, therefore, whether any others might either pose a threat or be in danger. . . .  These facts created uncertainty that, given Thacker's lack of cooperation, could only be dispelled by entering the home and investigating further. . . .  Thus, the potential dangers attendant to a cutting or stabbing call, the fact that plaintiff's solicited the response they received, the need to safeguard the paramedics and others, including creating a safe environment and figuring out what happened, and the need to act swiftly to tend to Thacker's injury justified the entry in this case.

*Id.* at 254-55.  An officer's need to safeguard paramedics and the dilemma that defendant officers confront when their efforts in response to a 911 call are rebuffed are also present in this case.

The Court now undertakes its task of applying the above general principles to Plaintiffs' warrantless entry claim.

Viewing the evidence in the light most favorable to Plaintiffs and considering the information available to the officers before they entered Plaintiffs' residence, this Court concludes that Defendant officers were justified under the exigent circumstances/emergency aid exception to enter Plaintiffs' home without a warrant.  At the time Defendant officers entered Plaintiffs' home, they had the following information:

  .  On December 22, 2008 at 7:49 p.m., Plaintiff Susan Stricker, a registered nurse, called 9-1-1 to report that her twenty-year old son, Plaintiff Andrew Stricker, was overdosing on "some kind of drugs," that she had "no clue" as to what the drug was, and requested EMS assistance at their home. Plaintiff Susan Striker reported her son's symptoms:  "He's falling down, he's losing consciousness, he's not in touch with reality, he can't talk to me, he's not telling me what he – what's his name or what he's doing, and he just can't stand up straight and he can't move . . . ."  (Doc. #53-2.)

  .  Sgt. Hunt of the Cambridge Police Department was the first officer to arrive.  The Cambridge Township Fire and Rescue personnel had already arrived and were waiting for the police to secure the scene.

Dispatch had provided Sgt. Hunt with the overdose victim's name, and he reported that he had previously arrested two heroin addicts who lived at the address provided in the 911 call, i.e., Plaintiff Andrew and his brother.

.   Sgt. Hunt knocked and was allowed into the home by Plaintiff Kevin Stricker, Andrew's father.  He told Sgt. Hunt that Andrew was not doing too good.  Sgt. Hunt's efforts to have paramedics come up from the drive to the home were rebuffed by Andrew's mother, Plaintiff Susan Sticker, after she learned that he was a police officer.  Sgt. Hunt left Plaintiffs' home and waited at the end of Plaintiffs' driveway with medical personnel.

.   Shortly thereafter, Deputy Sheriff VanDyke arrived in response to a dispatch requesting that he assist the Cambridge Township Fire Department on a reported drug overdose.  Sgt. Hunt told him that he had observed Plaintiff Andrew sitting in a chair at a table, looking very pale; that Plaintiff Kevin let him in the home and told him that Andrew was not doing too good and that Plaintiff Susan ordered him off the property after he told her he was a cop.  Deputy VanDyke and Sgt. Hunt went back up to Plaintiffs' residence, told Plaintiffs that they needed to make sure Andrew was okay, but Plaintiffs' Susan and Kevin Stricker refused to open the door unless they got a warrant.  Plaintiffs' Susan and Kevin insisted that Andrew was fine, ordered Defendants off their property, and Plaintiff Susan said she wanted to talk to the Michigan State Police.  Deputy VanDyke and Sgt. Hunt then retreated from Plaintiffs' front door and waited for the Michigan State Police to arrive.

.   State Trooper McMullen then arrived on the scene.  She was dispatched to Plaintiffs' home on a possible heroin overdose and was also informed that the woman who had called 911 from Plaintiffs' residence was now refusing to let officers into the house and had specifically requested the presence of the Michigan State Police.  Upon her arrival, she was briefed by Deputy VanDyke and Sgt. Hunt who told her that the possible overdose victim was a known heroin user by the name of Andrew Stricker.  Deputy VanDyke and Sgt. Hunt then accompanied Trooper McMullen to Plaintiffs' front door.  Her attempts to have Plaintiffs Susan and Kevin allow access to their son Andrew so a welfare check could be performed in response to Susan's 911 call reporting a drug overdose were also rebuffed.  Despite Defendants' explanation that a police presence was required to safeguard the scene for the paramedics, Plaintiffs refused to allow Andrew to come outside or the police to enter

29

their home to make sure Andrew was okay.

. After unsuccessful attempts to get Kevin to allow Andrew to come outside or officers inside, Plaintiff Kevin was observed standing at another window with Andrew. Plaintiff Andrew appeared very pale, could not focus on Trooper McMullen's face even though their faces were only a few inches apart, his eyes were moving cross eyed and apart, his eyelids looked very heavy, he did not appear alert or in any condition to refuse medical treatment and also appeared to be holding himself up to keep from falling by placing his hands on the window. Andrew rebuffed Trooper McMullen's attempts to get him to come outside on the porch so he could be checked by medical personnel.

. Trooper McMullen contacted Defendant Sgt. Stuck, the duty sergeant at the Michigan State Police Department, and advised her of the situation. Sgt. Stuck determined that a medical emergency warranted a forced entry and advised Defendant officers to force open Plaintiffs' door and they did. Trooper McMullen also contacted Defendant Asst. Prosecutor Riley and advised him of the situation. He reached the same conclusion as Sgt. Stuck. The factors that informed Defendants' decision to enter without a warrant included: the 911 call reporting a drug overdose; their knowledge that Andrew had previously used heroin, Andrew's and his parents' refusal to allow him to receive medical attention despite the 911 call reporting a drug overdose, and their observations of Andrew after that call.

. After Deputy VanDyke and Sgt. Hunt unsuccessfully tried to force the front door open with their feet, Sgt. Hunt used a halligan tool to force the front door open. Trooper McMullen was the first to enter and did so with her weapon drawn. Defendants VanDyke, Hunt, and Kourt followed and helped conduct a protective sweep of Plaintiffs' home, including the basement, the basement bedroom of Plaintiff Andrew's brother, Plaintiff Susan's locked bedroom, and Plaintiff Jacqueline's bedroom.

. Sgt. Stuck from the Michigan State Police arrived on the scene after the forced entry and protective sweep were completed. Plaintiffs Susan and Kevin Stricker had requested her presence, and when they saw her they asked her to "unarrest" them. Sgt. Stuck declined their requests.

Because it is not contested that Defendant Stuck entered Plaintiffs' residence at

Plaintiffs' request or consent, Plaintiffs cannot state a Fourth Amendment unlawful entry claim against her. Moreover, because no reasonable juror could conclude that it was objectively unreasonable for Defendants Hunt, McMullen, Kourt and VanDyke to enter Plaintiffs' residence under the exigent circumstances/emergency aid exception to the warrant requirement of the Fourth Amendment, there can be no Fourth Amendment or conspiracy claim based on Defendants' warrantless entry or any supervisory, prosecutorial, or municipal liability[7] for Defendants' warrantless entry.

Viewed in the light most favorable to Plaintiffs, there is no question of fact that it was objectively reasonable and thus constitutional under the emergency aid exception for Defendant officers to enter Plaintiffs' home without a warrant. Defendants Hunt, VanDyke, McMullen and Kourt were entitled to rely on their collective knowledge, including Plaintiff Susan's 911 call reporting a drug overdose and description of her son's condition, information that Andrew and his brother were known as heroin users, and personal observations of Andrew in a near catatonic state. *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989). Based on the facts known to Defendant officers at the time of their entry, it was objectively reasonable for them to determine that Andrew was overdosing on drugs and in need of immediate medical evaluation and attention. The decisions in *Brigham City, Fisher, Johnson, and Thatcher* support this Court's conclusion.

Despite Plaintiffs' arguments to the contrary, "'[o]fficers do not need ironclad proof of

---

[7]As the Supreme Court recently reiterated in *Los Angeles County v. Humphries*, 131 S. Ct. 447, 449 (2010), the well-established principle that "civil rights plaintiffs suing a municipal entity under 42 U.S.C. § 1983 must show that their injury was <u>caused by</u> a municipal policy or custom." (Emphasis added). Absent a constitutional injury, Plaintiffs cannot show the causal link required for a § 1983 claim of municipal liability.

'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Johnson*, 617 F.3d at 868 (quoting *Fisher*, 130 S. Ct. at 548).  Despite Plaintiffs' arguments to the contrary, a warrantless entry into a 911 caller's home is justified under the emergency aid exception even when the caller refuses entry to police because "he had called for paramedics – not the police."  *Thacker*, 328 F.3d at 249, 255.

Moreover, Plaintiffs' reliance on the district court decision in *United States v. Meixner*, 2000 WL 1597736, is misplaced for the reasons stated by the Sixth Circuit in *Johnson* and discussed above.   Plaintiffs' reliance on non-binding decisions from other Circuits is similarly misplaced in light of the Sixth Circuit's binding decisions in *Johnson* and *Thacker*. Finally, Plaintiffs' arguments that Defendants were more interested in making a drug arrest than rendering medical assistance is precisely the sort of subjective-motivation argument rejected in *Brigham City*, 547 U.S. at 404, as irrelevant to Fourth Amendment analysis.[8]

The Court now addresses Plaintiffs' argument that Defendant officers' protective

---

[8]As noted earlier, the Supreme Court recently reiterated this well-established principle. In *Kentucky v. King*, without deciding whether exigent circumstances did in fact exist, the Court reversed the lower court's decision because it applied a subjective approach.  The Court "emphasized that '[o]ur cases have repeatedly rejected' a subjective approach, asking only whether 'the circumstances, viewed *objectively*, justify the action.'"  131 S. Ct. at 1859 (quoting *Brigham City*, 547 U.S. at 404 (alteration and internal quotation marks omitted)).  The *King* Court "noted that '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving.'"  *Id.* at 1860 (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).  The *King* Court also criticized those courts that faulted law enforcement officers who, despite acquiring evidence sufficient to establish probable cause to search, chose not to first seek a warrant before "knock[ing] on the door and seek[ing] to speak with an occupant or to obtain consent to search."  *Id.* at 1860.  "Faulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is nowhere to be found in the Constitution."  *Id.* at 1861.

sweep violated their Fourth Amendment rights.

### B. Defendants Protective Sweep of Plaintiffs' Residence Was Justified

Plaintiffs also challenge the need for, duration, and scope of the protective sweep conducted by Defendant officers upon their entry into Plaintiffs' home.  This Court agrees with Defendants that there was no Fourth Amendment violation.[9]  This conclusion finds support in the Sixth Circuit's decisions in *Johnson* and *Thacker*.  In *Johnson*, the court affirmed the district court's finding that the police were justified in sweeping the home "for a person in need of immediate assistance under the emergency aid exception."  617 F.3d at 870.  In *Thacker*, the Sixth Circuit agreed with the defendant officers who argued that "they were required to determine whether anything or anyone in plaintiffs' home posed a risk of danger either to themselves or to the paramedics who sought to enter the home to attend to the injured, or, alternatively, to someone inside the home."  328 F.3d at 253.  Thus, despite Plaintiffs' arguments to the contrary, the protective sweep conducted by Defendants Hunt, VanDyke, Kourt, and McMullen both to locate the reported overdose victim, Plaintiff Andrew, and others in an effort to secure the premises so the paramedics could safely treat him despite his parents' active resistance, was constitutional under the Fourth Amendment.

When Trooper McMullen entered, she observed Plaintiff Kevin Stricker descending the stairs just inside the front door.  She ordered him to the ground, placed him in

---

[9]Because there was no Fourth Amendment violation, there can be no conspiracy claim based on Defendants' protective sweep or any supervisory, prosecutorial, or municipal liability for Defendants' protective sweep.  *See Wiley v. Oberlin Police Dep't*, 330 F. App'x 524, 529-30 (6th Cir. 2009) (dismissing conspiracy, prosecutorial and municipal claims for this same reason).

handcuffs, patted him down for weapons, and then moved on to continue the protective sweep with Deputy VanDyke. Sgt. Hunt stayed with Plaintiff Kevin and secured the entry point and the stairway. Plaintiff Andrew, the reported overdose victim, was not in the immediate area. After conducting a protective sweep of the ground floor and finding neither Plaintiff Andrew or his mother, Plaintiff Susan, Trooper McMullen and Deputy VanDyke then went to the basement and found Plaintiff Andrew hiding behind some items. VanDyke placed Plaintiff Andrew in handcuffs and patted him down for weapons. Trooper McMullen continued the protective sweep to a closed bedroom that Plaintiff Andrew identified as belonging to his brother William. The area was swept, and no persons were found.

Plaintiff Andrew was removed from the basement to the front door area. Deputy VanDyke secured his father, Plaintiff Kevin, just inside the front door, and Deputy Kourt and Sgt. Hunt ascended the stairs to the upper level of Plaintiffs' home to continue the protective sweep. Trooper McMullen got Andrew to the ambulance that was waiting at the end of Plaintiffs' driveway. She then returned to the front door area and learned that the protective sweep of the upstairs had yielded Andrew's mother, Plaintiff Susan, and his 14-year-old sister Jacqueline. Deputy Kourt forced open Plaintiff Susan's locked bedroom door, checked her for weapons and placed her in handcuffs. Deputy VanDyke forced open Jacqueline's closed bedroom door and moved her to Plaintiff Susan's room before both were moved downstairs. Once downstairs, Deputy Kourt placed the handcuffed Susan in a chair. The State Police arrested Plaintiffs Susan and Kevin for resisting and obstructing a police officer. Plaintiff Andrew was arrested for substance use.

Despite Plaintiffs' arguments to the contrary, the need for a protective sweep did not

cease once Plaintiff Andrew was removed from the home so that he could be treated by the paramedics who were situated at the end of Plaintiffs' drive.  In light of Plaintiffs' undisputed active resistance to attempts to treat Andrew in response to Plaintiff Susan's 911 call reporting a drug overdose, it was objectively reasonable for Defendant officers to continue with their protective sweep to locate Plaintiff Susan and other persons who may be present in the home and to continue their efforts to secure the premises so the paramedics could safety attend to Andrew's medical needs and to ensure both their safety and that of the officers present in Plaintiffs' home.  The exigent circumstances ceased only after Plaintiff Andrew was sufficiently stabilized and the ambulance left the premises to transport him to the hospital.  Moreover, as the Sixth Circuit observed in *Thacker*, "the dual needs of safeguarding the paramedics while tending to [the 911 victim]'s injury, created exigent circumstances here. . . .  The safety of the paramedics and others . . . must be considered." 328 F.3d at 254-55.  *See also Brooks v. Rothe*, 577 F.3d 701, 708 (6th Cir. 2009) (concluding that the defendant officer's entry "was justified by exigent circumstances – the possibility of destruction evidence and the risk of serious injury to other shelter residents, including children" because "the information objectively available to an officer at the scene, regardless of Defendants' subjective intentions, was that a person had overdosed on drugs and that an attempt was made to conceal that fact from police.").

Plaintiffs also challenge the scope of the protective sweep.  Even if Hunt, McMullen, Kourt or VanDyke did search dressers, cabinets and drawers as Plaintiff speculates in her

supplemental affidavit (S. Stricker's 3/23/11 Suppl. Aff., ¶ 5.),[10] that conduct would not exceed the scope of a permissible search under the undisputed facts presented here.  It would be reasonable for officers responding to a 911 call reporting an overdose from an unknown drug to conduct a search consistent with a quest for clues about what kind or quantity of drugs Andrew may have ingested so as to provide valuable information for the paramedics who were attempting to treat him.  The same is true of Trooper McMullen's questions to Jacqueline about the presence or use of illegal drugs in the Stricker home (J. Stricker 3/23/11 Aff., ¶ 3) especially in light of Plaintiff Susan's 911 report of Andrew's drug overdose followed by rebuffs of emergency assistance by Andrew and both parents and the fact that Defendant officers had been informed that Andrew was known to be a heroin user.  *See, e.g., McKenna v. Edgell*, 617 F.3d 432, 444 (6th Cir. 2010) (observing that an officer's search in response to a 911 call reporting a medical emergency "reasonably would be consistent with a quest for clues about [the 911 victim]'s medical condition, information that would be valuable to his treatment"), *cert. denied*, 131 S. Ct. 1790 (2011).

The Court now addresses Plaintiffs claims of unreasonable seizure and/or arrest without probable cause.

### C.  There Was No Unreasonable Seizure or Arrest Without Probable Cause

Plaintiffs also assert a Fourth Amendment violation with regard to their seizure and/or arrest.  Each Plaintiff's claim is addressed below.

---

[10]Despite Plaintiffs' allegation in their amended complaint and their attorney's arguments in briefs, there is no admissible evidence that Defendant VanDyke searched Jacqueline's bedroom dresser drawers or other places in her bedroom where a person could not hide.

### 1.  Minor Plaintiff Jacqueline Stricker - Unlawful Seizure Claim

In Count 48 of their amended complaint, Plaintiffs allege that Defendant Kourt violated the minor Plaintiff, Jacqueline Stricker,'s Fourth Amendment rights.  Defendant McMullen insisted that arrangements be made so Jacqueline would not be left at the Stricker home alone and Defendant Kourt remained with her until a  family friend picked her up and took her to their home for the night.  (Pls.' Am. Compl., ¶ 263.)  Defendant Kourt correctly asserts that the minor Plaintiff does not have the legal capacity to sue and, because next friend status has not been obtained, her parents Susan and Kevin Stricker do not have standing to assert claims on her behalf.  Plaintiffs do not dispute that Fourth Amendment claims are personal rights that may not be vicariously asserted.  *See Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978).  Rather, Plaintiffs respond that the minor Plaintiff has applied to the Lenawee County Probate Court for the appointment of a Conservator and is awaiting a hearing date.  Even if Plaintiffs Susan or Kevin do obtain next friend status for the minor Plaintiff, the undisputed facts here do not establish a Fourth Amendment violation. Plaintiffs cite no legal authority supporting any such claim.

### 2.  Plaintiff Andrew Stricker - Unlawful Seizure Claim

In Count 36 of their amended complaint, Plaintiffs allege that Defendant VanDyke violated Plaintiff Andrew's Fourth Amendment rights when he "handcuffed" Plaintiff Andrew "without probable cause."  (Pls.' Am. Compl., ¶ 216.)  It is not disputed that Plaintiff Andrew was seized, handcuffed, and patted down for weapons by Defendant VanDyke when he was discovered hiding in the basement after Defendant officers forcibly entered his home in response to the 911 call that he was overdosing on drugs and after Plaintiff Andrew and

his parents rebuffed the responding officers' attempts to secure the scene for the paramedics so they could treat him. Andrew was handcuffed for the safety of the officers. Defendant McMullen took him to waiting medical personnel for treatment where he received medical attention. Andrew admitted that he took a combination of prescription and illegal drugs, i.e., seven 1 mg. pills of Xanax along with one half of a tenth of a gram of heroin around 7:00 p.m. He had a heart rate of 160, was given 2 mg. of Narcon in the ambulance, and rushed to the hospital. As discussed above, the protective sweep and seizure of Plaintiff Andrew so he could be treated by the paramedics on the scene was objectively reasonable under the circumstances. Plaintiffs' arguments to the contrary are unpersuasive for all the reasons stated above.[11]

### 3. Plaintiffs Kevin and Susan Stricker - Unlawful Arrest Claims

In Count 31 of their amended complaint, Plaintiffs allege that Defendant McMullen violated Plaintiff Kevin's Fourth Amendment right to be free from an unreasonable seizure because she lacked probable cause to arrest him for assault/resist/obstructing a police officer in violation of Mich. Comp. Laws § 750.81d. (Pls.' Am. Compl., ¶ 197.) Despite asserting an unlawful arrest claim, Plaintiff Kevin concedes that he ultimately pled guilty to

---

[11]Plaintiffs' amended complaint does not allege a Fourth Amendment violation arguing that Plaintiff Andrew was unreasonably seized as a result of being arrested without probable cause. Even if it did, this claim would be dismissed for the reasons stated in the discussion below addressing Plaintiffs Susan's and Kevin's claims of a wrongful arrest. As the Supreme Court observed in *Devenpeck v. Alford*, 543 U.S. 146, 155 (2004), there is no Fourth Amendment violation even if the police officer does not have probable cause for the specific offense charged as long as the arresting officer has probable cause to make an arrest for any violation. Here, for the same reasons that there was probable cause to arrest his parents, Defendant officers had probable cause to believe that Plaintiff Andrew had obstructed them in the performance of their lawful duties and violated Mich. Comp. Laws § 750.81d.

attempting to resist or obstruct arrest in violation of Mich. Comp. Laws § 750.81d(1) and § 750.92.

In Count 15, Plaintiff Susan similarly alleges that Defendant Kourt violated her Fourth Amendment right to be free from an unreasonable seizure because he lacked probable cause to arrest her for assault/resist/obstructing a police officer in violation of Mich. Comp. Laws § 750.81d.  (Pls.' Am. Compl., ¶ 141.)  The resisting arrest charge against Plaintiff Susan was later dismissed.

The Sixth Circuit recently observed that Mich. Comp. Laws § 750.81d "can be violated in two ways:  by physically resisting a command, whether lawful or unlawful, *or* by refusing to comply with a lawful command without using force."  *Brooks*, 577 F.3d at 707 (commenting that its interpretation of the statute "is supported by the Michigan Court of Appeals' opinion in *People v. Ventura*, 262 Mich. App. 370, 686 N.W.2d 748 (2004)").  Both Plaintiffs argue that probable cause to arrest them for resisting/obstructing arrest was lacking here because (1) neither of them *physically* resisted a command; and (2) their *non-physical* resistance was to a command that was not "lawful."  The Court begins its analysis with the general legal principles that govern this issue.

As the Supreme Court observed in *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004), "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."  The probable cause determination "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  *Id.*  "A police officer determines the existence of probable cause by examining the facts and circumstances

39

within his knowledge that are sufficient to inform a prudent person, or one of reasonable caution, that the suspect has committed, is committing, or is about to commit an offense." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (internal quotation marks and citation omitted).  Moreover, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."  *Devenpeck*, 543 U.S. at 153.  Stated otherwise, "his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."  *Id.*  Applying these core principles, the *Devenpeck* Court held that "[t]hose are lawfully arrested whom the facts known to the arresting officers give probable cause to arrest."  *Id.* at 155.

Construing the facts in the light most favorable to Plaintiffs, this Court concludes that Defendants McMullen and Kourt had probable cause to believe that Plaintiffs Susan and Kevin had violated Michigan's statute making it a felony if "[a]n individual . . . resists, obstructs . . . a person who the individual knows or has reason to know is performing his or her duties,"  Mich. Comp. Laws § 750.81d(1), and defines "obstructs" to include "a knowing failure to comply with a lawful command," Mich. Comp. Laws § 750.81d(7)(a). Even if this Court were to do as the *Brooks* court did and accept Plaintiffs' argument that their refusal to open the locked front door, Kevin's attempt to hide from the police by descending the stairs just inside the front door, and Susan's attempt to hide behind her locked bedroom door "amounted to a simple refusal to comply" with Defendants' commands, their Fourth Amendment argument "falls short" because Defendants' "demand to be admitted" into Plaintiffs' home "was justified by exigent circumstances" – the need to render emergency aid to Andrew and to safeguard the scene for the paramedics and the

40

safety of the officers and others.  *Brooks*, 577 F.3d at 708.  Moreover, the undisputed facts known to Defendants McMullen and Kourt would "warrant a prudent man in believing that the offense [a violation of § 750.81(d)(1)] ha[d] been committed."  *Id.* at 709 (internal quotation marks and citations omitted).  Specifically, Plaintiffs knew that Defendants McMullen and Kourt were police officers, knew that Defendants were responding to Plaintiff Susan's 911 call reporting that her son Andrew was overdosing on drugs, knew that Defendants wanted to secure the premises for the safety of the paramedics, the police and others so Andrew could safely be treated, and yet Plaintiffs Susan and Kevin repeatedly refused to comply with Defendants' lawful command to allow them to enter.  For these reasons, Defendants McMullen and Kourt had probable cause to believe that Plaintiffs Kevin and Susan had obstructed them in the performance of their lawful duties.[12] Accordingly, Plaintiffs' Fourth Amendment wrongful arrest claims fail.[13]

The Court now addresses Plaintiffs' claims alleging excessive force.

### D.  There Was No Fourth Amendment Violation for Excessive Force

Plaintiffs Susan, Kevin, and Andrew each allege Fourth Amendment excessive force claims.

---

[12]In light of this conclusion, there is no need to address Defendant McMullen's additional argument that Plaintiff Kevin's Fourth Amendment wrongful arrest claim is barred by *Humphrey v. Heck*, 512 U.S. 477 (1994).  If the Court were to consider the argument, it would agree with Defendant.

[13]Because there was no Fourth Amendment violation on Plaintiffs' claims that they were unlawfully seized or arrested without probable cause, there can be no conspiracy claim based on those allegations or any supervisory, prosecutorial, or municipal liability in connection with those claims.  *See Beckett v. Ford*, 384 F. App'x 435, 457-58 (6th Cir. 2010) (dismissing civil conspiracy claims because probable cause existed).

In Count 15, Plaintiffs' amended complaint alleges an excessive force claim by Plaintiff Susan against Defendant Kourt because he pointed a taser gun at her and handcuffed her hands "tightly" behind her back.  (Pls. Am. Compl., ¶¶ 141-42.)  In their motion, Plaintiffs further assert that Defendant Kourt used excessive force on Plaintiff Susan when he pointed a taser gun at her, forced her to lay face down on the floor, "roughly" handcuffed her, ordered her to stand up and then, when she had difficultly doing so, used a pressure hold on her neck to force her to do so.  (Pls. Mot. at 10.)

In Counts 29 and 31, Plaintiffs' amended complaint alleges an excessive force claim by Plaintiff Kevin against Defendants Hunt and McMullen.  As to Defendant Hunt, Plaintiff Kevin alleges that his Fourth Amendment rights were violated when he was forced to lay of the floor face down with his hands cuffed behind his back for approximately 20 minutes. (Pls.' Am. Compl., ¶ 190.)  As to Defendant McMullen, Plaintiff Kevin makes the same complaint and further alleges that she "roughly" handcuffed him while forcefully holding a gun to his head.  (*Id.* at ¶ 196.)

In Count 36, Plaintiffs' amended complaint alleges an excessive force claim by Plaintiff Andrew against Defendant VanDyke for handcuffing him.  (Pls.' Am. Compl., ¶ 216.)

Defendants respond that, under the undisputed facts presented here, there can be no Fourth Amendment excessive force claim.  This Court agrees.

"Claims of excessive force are analyzed under an objective-reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene."  *Miller v. Sanilac County*, 606 F.3d 240, 251 (6th Cir. 2010).  The Court's task is to ask "whether, under the totality of the circumstances, the

42

officer's actions were objectively reasonable." *Id.* (internal quotation marks and citation omitted).   In evaluating an excessive force claim, three factors are considered:  "the severity of the crime, whether the suspect posed an immediate threat to the safety of officers or others, and whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

As to claims of "excessively forceful handcuffing during the course of a seizure," the Sixth Circuit provides additional guidance.   *Miller*, 606 F.3d at 252.   "In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that:  (1) he or she complained that the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Id.*

No reasonable jury could find that Defendants used excessive force in connection with the handcuffing of Plaintiffs Susan, Kevin, or Andrew.   There is no evidence that Plaintiffs complained that their handcuffs were too tight, that Defendants ignored complaints of tightness, or that they suffered some physical injury as a result of their handcuffing. Moreover, as Defendants point out, Plaintiff Kevin's allegation that Defendant McMullen handcuffed his hands behind his back while forcefully holding a gun to his head is both factually implausible and physically impossible.   Further, as to Plaintiffs' remaining claims of excessive force, viewing the facts in the light most favorable to Plaintiffs but also from the perspective of a reasonable officer on the scene, no reasonable jury could find that Defendants used excessive force.   Rather, because Plaintiffs had repeatedly resisted Defendant officers' lawful commands and attempts to secure the scene so paramedics

43

could treat Plaintiff Andrew and had attempted to flee from and evade Defendant officers, it was objectively reasonable for Defendant officers (1) to point a gun at Plaintiff Kevin upon entry into the home and force him to the floor to be handcuffed, (2) to force Plaintiff Kevin to lie handcuffed on the floor until the second floor was secured, (3) to point a taser gun at Plaintiff Susan upon entry into her locked bedroom and likewise force her to the floor to be handcuffed, (4) to subsequently force her to stand after, what she described as having difficulty getting up but could be interpreted by a reasonable officer on the scene as further resistance to lawful commands, and (5) to force her to join her handcuffed husband on the first floor where both were then seated in chairs until Andrew was attended to by the paramedics and transported to the hospital.  "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'" *Miller*, 606 F.3d at 253 (quoting *Graham*, 490 U.S. at 396).[14]

## IV.   Conclusion

For the above-stated reasons, Plaintiffs' motion for partial summary judgment is DENIED, and Defendants' motions to dismiss and for summary judgment are GRANTED. All the claims in Plaintiffs' amended complaint are DISMISSED WITH PREJUDICE.

---

[14]Because there was no Fourth Amendment violation for excessive force, there can be no supervisory or municipal liability or any other § 1983 claim based on any such violation.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  August 1, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record
on August 1, 2011, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager